# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 21-579V

| | |
|---|---|
| TIFFANY MCKNIGHT,<br><br>                  Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                  Respondent. | Chief Special Master Corcoran<br><br>Filed: September 23, 2025 |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL*, for Petitioner.

*Catherine Elizabeth Stolar, U.S. Department of Justice, Washington, DC*, for Respondent.

### **FINDING OF FACT REGARDING SITUS AND ONSET**[1]

On January 12, 2021, Tiffany McKnight filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 7, 2019. Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find it more likely than not that the subject vaccination was administered in Petitioner's left deltoid, and that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination, as alleged.

## I. Relevant Procedural History

Respondent filed his Rule 4(c) Report in February 2024, arguing (in relevant part) that Petitioner had failed to show a Table injury because her medical records did not support the conclusion that she received the alleged vaccination in her left shoulder, as the vaccine administration record reflects a right-arm situs. Respondent's Report at 6, ECF No. 43 (internal citations omitted). More so, Respondent contended that Petitioner's medical records do not show that the onset of her pain occurred within 48 hours of vaccination. *Id.* at 6-7.

I accordingly ordered the parties to submit briefings regarding Petitioner's eligibility to entitlement, only. Non-PDF Order, docketed Apr. 22, 2024. Petitioner thereafter filed a Motion for a Ruling on the Record on July 26, 2024. Mot., ECF No. 46. In September 2024, Respondent filed his Response Brief. Resp., ECF No. 47. Petitioner filed a Reply thereafter on October 29, 2024. Reply, ECF No. 48. This matter is thus now ripe for consideration.

## II. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014). The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

III.   **Relevant Factual Evidence**[3]

Petitioner received the subject flu vaccine on October 7, 2019, at her place of employment. The vaccine administration record reflects a computerized, drop-down menu, selecting the injection site as the "right deltoid" – contrary to Petitioner's allegations. Ex. 2 at 3.

---

[3] Only those facts relevant to site of vaccination and onset will be discussed herein, though other facts may be provided as necessary.

In her original signed declaration (authored in August 2021), Petitioner attests that her vaccine administration record "incorrectly labeled the influenza vaccine as having been administered into her right deltoid." Ex. 4 ¶ 6. She asked for this note to be amended "[o]n numerous occasions," but "was told the record could not be amended." *Id.* Petitioner also states that "[w]hen [she] received the vaccination, [she] felt pain and soreness around the injection site and in [her] left shoulder." *Id.* The "pain in [her] left shoulder gradually worsened and began to impact the range of motion [("ROM")] and mobility of [her] left arm and shoulder." *Id.* ¶ 8.

Petitioner describes these circumstances with more particularity in her supplemental declaration, drafted in October 2023. Petitioner maintains that one-to-two months post vaccination, when she became aware of the error in her vaccine administration record, she asked the administrators to correct the record but they "refused and said it was too late to amend the record." Ex. 10 ¶ 6. She also contends that she "felt immediate pain and soreness around the injection site and in [her] left shoulder" after receiving the subject vaccination. *Id.* ¶ 4. She continues that, "[o]ver the course of the next month," she attempted to treat her injury on her own by "stretching and rotating [her] left arm," applying heat and ice, and taking over-the-counter medications. *Id.* ¶ 5.

Approximately five weeks post vaccination, on November 18, 2019, Petitioner had a visit with her primary care provider ("PCP") for unrelated asthma complaints. Ex. 1 at 15. The medical records do not reflect shoulder complaints raised during this visit, but state that Petitioner had "multiple other issues," and that she was advised to "schedule an additional appt. [sic] to discuss them further." *See id.* Petitioner maintains that she mentioned her left shoulder symptoms (that started after the subject vaccination) to her PCP during this visit, but "was told to make a separate appointment" to address her shoulder issues, since this visit had a different purpose. Ex. 4 ¶ 10; Ex. 10 ¶ 8.

On December 5, 2019 (now approximately 59 days post vaccination), Petitioner returned to her PCP for her ongoing asthma issues. Ex. 1 at 11. The PCP also noted that Petitioner "is still having pain in her left arm after getting the flu vaccine through work." *Id.* A physical examination of the "extremities" did not reveal shoulder abnormalities. *Id.* at 12-13. The PCP told Petitioner to "continue monitoring [her upper extremity] pain." *Id.* at 13.

Petitioner sought care on several occasions thereafter for acute and unrelated respiratory issues (in March and May 2020). *See,* e.g., Ex. 1 at 5-6; Ex. 5 at 34-51; Ex. 7 at 83-91; Ex. 9 at 35-37. Petitioner did not return for shoulder treatment until June 22, 2020 – six months since her last visit for left shoulder pain. Ex. 1 at 2.

4

During the June 22nd PCP visit, Petitioner "complain[ed of] left arm pain." Ex. 1 at 2. Specifically, "[s]he still ha[d] pain in left upper arm pain [sic] since receiving influenza vaccine through work in late September/early October." *Id.* Petitioner explained that the pain was "not every day but [that she] still ha[d] soreness most days." *Id.* A physical examination revealed no abnormalities in the extremities. *Id.* at 3. The assessment did not reference the left shoulder, and no further treatment for Petitioner's left shoulder was recommended. *Id.* at 3-4.

Despite this, under the treatment plan for "other" ailments, the PCP wrote that Petitioner had "reported on more than one occasion, left upper arm pain since injection" and that the treater provided a "letter . . . regarding this." Ex. 1 at 4. Indeed, Petitioner's PCP authored a short note (dated June 22, 2020), stating that Petitioner "was seen [] today for a doctor's appointment. She has reported on more than one occasion of ongoing left upper arm pain since receiving the influenza vaccine in the fall of 2019 through her work that has not resolved." Ex. 3 at 1.

Petitioner did not return to care for her left shoulder complaints for an extended period of time, despite seeking care for unrelated ailments throughout 2020 and into 2021. *See,* e.g., Ex. 7 at 20-24, 93-105; Ex. 9 at 19-26.

On April 22, 2021 (now ten months since her last visit for left shoulder pain), Petitioner sought care at an urgent care facility for bilateral ankle swelling. Ex. 7 at 109. She also "[c]omplain[ed] of continued intermittent sharp pains in her left arm . . . that she later reported as a vaccine injury . . . that is still under investigation." *Id.* Petitioner underwent an x-ray of the left shoulder, which was normal. *Id.* at 111. The urgent care treater's assessment included left arm pain "? SIRVA," and Petitioner was told to follow up with her PCP. *Id.* at 112.

On July 15, 2021, Petitioner established care with a new PCP for several complaints. Ex. 7 at 7. She "talked about having pain in the left upper extremity and believes that it is related to vaccination." *Id.* at 8. She also noted she was "working with Workmen's Comp. [sic] and did not want any intervention regarding that issue today." *Id.* An examination did not reveal abnormalities. *Id.* The assessment included "left shoulder pain." *Id.* at 9. No other medical records or affidavit/declaration evidence has been submitted regarding the onset of Petitioner's symptoms or vaccine situs.

5

IV.     **Findings of Fact**

**A. Site of Vaccine Administration**

Despite Respondent's objections to the contrary (e.g., Resp. at 1-2), the record supports the conclusion that Petitioner's October 7, 2019 flu vaccine was likely administered in her left shoulder, as alleged. As the above-referenced medical entries establish, when seeking medical treatment for shoulder pain on every post-vaccination occasion, Petitioner consistently reported *left* shoulder pain (which she also attributed to her flu vaccination), and she underwent diagnostic procedures and some mild self-treatment of the left shoulder. *See,* e.g., Ex. 1 at 2, 11; Ex. 7 at 109-11.

It is true that the vaccine administration record *itself* memorializes the site of the administration of Petitioner's flu vaccine as the right arm – with a drop-down entry selecting the "right deltoid." Ex. 2 at 3. I have often noted that it is not unusual for the information regarding situs of vaccination set forth in this kind of document to be incorrect.[4] In many instances, that information is recorded prior to vaccination and is not subsequently corrected, even if the vaccine is then administered in the opposing arm.[5] Thus, although such records are unquestionably the first-generated documents bearing on the issue of site, they are not *per se* reliable simply because they come first. In fact, I have previously determined that the very nature of vaccination record creation provides some basis for not accepting them at face value. *See,* e.g., *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-881V, 2022 WL 2284311, at *4 (Fed. Cl. Spec. Mstr. May 13, 2022).

At the same time, I routinely give greater weight to vaccination records that are handwritten – meaning those that require specific action on the part of the vaccine administrator, as opposed to those that are automatically generated by a computerized system. *See,* e.g., *Rizvi,* 2022 WL 2284311, at *5; *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020).

---

[4] *See,* e.g., *Arnold v. Sec'y of Health & Hum. Servs.,* No. 20-1038V 2021 WL 2908519, at *4 (Fed. CL. Spec. Mstr. June 9, 2021); *Syed v. Sec'y of Health & Hum. Servs.,* No. 19-1364V, 2021 WL 2229829, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 28, 2021); *Ruddy v. Sec'y of Health & Hum. Servs.*, No 19-1998V, 2021 WL 1291777, at *5 (Fed. Cl. Spec. Mstr. Mar. 5, 2021); *Desai v. Sec'y of Health & Hum. Servs.*, No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

[5] In a recent Ruling by another special master, the pharmacist who had administered the relevant vaccination actually testified that she inputs "left deltoid" into the computer system as a matter of course, without confirming the actual site of vaccination, based upon the assumption that most vaccinees are right-handed. *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2021).

The vaccine administration form at issue in this case is an automated entry in a computerized system – meaning it should not be presumed to be accurate. And it is the only evidence in this case that contradicts Petitioner's assertion and supports a finding of right arm situs. Given the general unreliability of automated vaccination records, and when weighed against Petitioner's clear, consistent, and somewhat close-in-time reports of left shoulder pain following her receipt of a flu vaccine in that arm, I find by a preponderance of the evidence that Petitioner received her October 7, 2019 flu vaccine in her left arm. To rule otherwise, I would need to see in the overall record more instances in which a different administration situs was suggested or supported.

**B. Onset**

A petitioner alleging a SIRVA claim must show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

As stated above, Respondent contends that Petitioner's medical records do not support the conclusion that the onset of her pain began within 48 hours of vaccination. *See,* e.g., Resp. at 4-6. But the totality of the evidence supports a favorable onset finding. Thus, the aforementioned medical records, coupled with Petitioner's signed declarations, establish that Petitioner consistently reported to treaters an onset close-in-time to vaccination, that she sought treatment for shoulder pain within 59 days of the October 7, 2019 vaccination (at the latest), and that she was experiencing symptoms in the relevant timeframe.

The fact that Petitioner sought treatment within two months of her vaccination (by December 5, 2019) is also partially supportive of Table onset. In other cases, *significantly greater* delays have not undermined an otherwise-preponderantly-established onset showing consistent with the Table. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury). The delay here is not nearly so long.

Likewise, the fact that Petitioner sought care on one occasion between the date of her vaccination and the December 5, 2019 visit – without mentioning left shoulder complaints specifically in the medical records – does not fully detract from her arguments

on onset. Notably, this visit (on November 18, 2019, with her PCP) was for unrelated asthma concerns. Ex. 1 at 15. Thus, I do not find that the absence of shoulder references in this record to prevent a showing of Table-consistent onset.

In fact, the records from Petitioner's November 18th visit show that while Petitioner's primary complaint was asthma, she also reported "multiple other issues" and was accordingly told to schedule an additional appointment to discuss them. Ex. 1 at 15. While those records do not mention left shoulder pain specifically, this statement is *consistent* with the medical records from Petitioner's December 5, 2019 visit (the first visit with a mention of left shoulder pain linked to the subject vaccination), wherein Petitioner's PCP noted that she was "*still* having pain in her left arm after getting the flu vaccine." *Id.* at 11 (emphasis added). These entries, taken together, support Petitioner's assertions in her declarations that she mentioned left shoulder pain to her PCP during her November 18th visit (and was told to schedule an additional appointment) but that such complaints were otherwise not included in the medical records. Ex. 4 ¶ 10; Ex. 10 ¶ 8.

In addition, the filed medical record establishes that Petitioner consistently and repeatedly dated her shoulder pain as occurring close-in-time to the subject vaccination – beginning with the December 5, 2019 visit, where she reported that she was "still having pain in her left arm after getting the flu vaccine through work." Ex. 1 at 11. Other subsequent medical records describe onset consistently as beginning soon after a vaccination she received at work. *See,* e.g., Ex. 1 at 2, 4 (a June 22, 2020 PCP report that she "[s]he still ha[d] pain in left upper arm pain [sic] since receiving influenza vaccine through work in late September/early October" and that she "reported on more than one occasion, left upper arm pain since injection"); Ex. 7 at 109 (an April 22, 2021 urgent care report of "continued intermittent sharp pains in her left arm . . . that she later reported as a vaccine injury."). Although these entries may suggest an onset beginning at some unspecified time in late September/early October, or generally after vaccination, they reflect a consistent reporting of onset following a vaccination received through Petitioner's employment. I thus do not find this evidence tips against a favorable onset determination. And, such entries corroborate the consistent contentions made in Petitioner's declarations that her pain began within 48 hours of vaccination. *See* Exs. 4, 10.

## Conclusion

Petitioner has established that she received the subject flu vaccination in her left shoulder, as alleged. Additionally, Petitioner has provided preponderant evidence that the onset of her shoulder pain occurred within 48 hours of vaccination.

These determinations do not resolve the matter, however; Respondent's remaining objection to a Table SIRVA (that Petitioner did not suffer from reduced ROM – Resp. at 2-3) (not discussed in this Ruling) *could* ultimately require more evaluation, and could likely be decided against Petitioner's favor upon closer inspection (resulting in dismissal of the Table claim *at a minimum*).[6] I thus *strongly* encourage the parties to promptly attempt an informal resolution of this claim before expending any further litigative resources on the case – but keeping in mind that this issue remains. If at any time informal resolution appears unlikely, given that the claim has been pending in SPU for well over one year (having been assigned in December 2022), the parties should propose a method for moving forward.

To that end (and to narrow the parties' settlement discussions), it should be kept in mind that this record presents *strong* evidence that the claimant's pain was not notably severe. Petitioner delayed seeking care to some degree; her care was intermittent with multiple lengthy gaps in treatment; and she did not undergo much treatment for her injury (consisting of a few medical visits and an x-ray). I can (and do) conclude from such a *limited* record that Petitioner lived with the pain easily, and for extended periods of time. These facts will impact any pain and suffering award issued in this case – and Petitioner must therefore act accordingly in calculating damages to be requested. Considering the record and the remaining outstanding issue in this case, Petitioner should not expect to receive full value and should expect an *extremely* modest award.

Accordingly, **by no later than Thursday, October 23, 2025**, the parties shall file a joint status report confirming the date on which Petitioner conveyed, or intends to convey, a reasonable settlement demand and supporting documentation for Respondent's consideration.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Indeed, the record provides hurdles in resolving this disputed issue and it is thus more closely contested. For example, Petitioner's records contain limited physical examinations, and it does not appear that Petitioner necessarily underwent testing to evaluate her ROM. Petitioner's PCP noted on physical examinations of the "extremities" that Petitioner did not have clubbing, edema, cyanosis, ulcers, or atrophy. *See,* e.g., Ex. 1 at 3, 13. These entries are somewhat inconsistent with the physical testing typically seen in SIRVA cases and therefore provide reasons to doubt that Petitioner's ROM was, in fact, tested. On the other hand, the entries from Petitioner's physical evaluations do not describe full ROM, either.